# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| DAVID CROWELL, | § |
| | § |
| *Plaintiff,* | § |
| | § |
| v. | § |
| | § |
| SHELL OIL COMPANY F/K/A OR D/B/A | § |
| PENNZOIL-QUAKER STATE COMPANY, SOPUS | § |
| PRODUCTS, L.L.C. F/K/A OR D/B/A | §    CIVIL ACTION H-05-03412 |
| PENNZOIL-QUAKER STATE COMPANY A/K/A | § |
| SOPUS PRODUCTS, PENNZOIL-QUAKER STATE | § |
| COMPANY, AND SHELL PENSION PLAN F/K/A | § |
| PENNZOIL-QUAKER STATE COMPANY | § |
| EMPLOYEES RETIREMENT PLAN, | § |
| | § |
| | § |
| *Defendants.*[1] | § |

## MEMORANDUM OPINION AND ORDER

Plaintiffs David Crowell and Paul Siegel bring these ERISA[2] actions against Shell Oil

Company and numerous other defendants (collectively, "Shell").  Although the plaintiffs filed their

suits separately, their cases were later consolidated, and they assert the same core claim.  Plaintiffs

contend that Shell misinterpreted a key provision of their retirement plans, causing a major reduction

in benefits in violation of ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B).  In addition, plaintiff

Crowell asserts a claim for a denial of documents to which he was allegedly entitled under ERISA's

---

[1] In this consolidated action, plaintiff Paul Siegel brings the member case, H-05-03724, against the identical defendants listed above and two additional defendants, Catherine Lamboley and Kelley Lang.  *Siegel* Dkt. 18 at 1.  On November 17, 2006, Siegel stipulated to the voluntary dismissal of all claims against Lamboley, *see Siegel* Dkt. 28, and Judge Gilmore signed an order to that effect shortly thereafter.  *See Siegel* Dkt. 29.

[2] Employee Retirement Income Security Act of 1974 ("ERISA"), Pub. L. No. 93-406, 88 Stat. 829, as amended, 29 U.S.C. § 1001 *et seq.* (2000).

disclosure provisions.  Shell responds that (1) plaintiffs' claims for benefits cannot succeed because the plan administrator correctly construed the Plan; and (2) Crowell's disclosure claim must fail because he did not name the proper defendant.

With regard to both of these claims, the court has carefully considered the parties' cross motions for summary judgment, the responses, the replies, and the applicable law.  The court agrees with Shell that the plan administrator did not abuse her discretion and that Crowell cannot recover in his nondisclosure claim against any of the named defendants, none of whom is liable under the applicable ERISA provisions.  Accordingly, Shell's motions for summary judgment (Dkt. 39; *Siegel* Dkt. 32) are GRANTED, Crowell's partial motion for summary judgment (Dkt. 35) is DENIED as moot, and Siegel's motion for summary judgment (*Siegel* Dkt. 34) is DENIED as moot.  Plaintiffs' requests for attorneys' fees and court costs under § 1132(g)(1) are also DENIED.

## I. FACTUAL BACKGROUND

The court will first summarize the undisputed facts for both cases before analyzing plaintiffs' ERISA claims.

### A.  The Merger and the Excess Plan

On March 25, 2002, Shell Oil Company ("Shell Oil") and Pennzoil-Quaker State Company ("Pennzoil") entered into a preliminary merger agreement in which Shell Oil agreed to acquire Pennzoil.  Dkt. 39, App. 1, Ex. G at PQS-003284-85.  The merger was completed on October 1, 2002, and Pennzoil formally became a wholly-owned subsidiary of Shell Oil.  Dkt. 18 at 3.

At the time the parties consummated the merger, Paul Siegel and David Crowell were longtime employees of Pennzoil.  Siegel had worked for Pennzoil since 1979, and Crowell had been with the company since 1992.  *Siegel* Dkt.32 at 4; Dkt. 39 at 4.  After the takeover, the employment

of both employees was terminated. *Siegel* Dkt. 32 at 4; Dkt. 39 at 4.  But, under letter agreements (the "Excess Plan") with Pennzoil consummated prior to the merger, both plaintiffs received substantial lump-sum payouts that supplemented the Pennzoil-Quaker State Company Employees Retirement Plan ("the Retirement Plan" or "the Plan").  Dkt. 39 at 4-5; *Siegel* Dkt. 18 at 4.

High-level employees received these additional payments to offset any benefit reductions under the Plan due to IRS limitations.  Dkt. 39 at 4-5.  Three primary forms of benefits were contemplated under the Excess Plan: (1) "a monthly pension for life" after retirement; (2) "a monthly pension for life" for spouses after the participants' deaths; and (3) the post-employment payment of sums that the participants would have received under Pennzoil's Savings and Investment Plan if not for certain tax code limitations.  Notably for purposes of deciding the pending motions, plaintiffs' benefits due under the Excess Plan depend on what types of compensation were included within the following Retirement Plan terms: "1997 considered compensation" and "Considered Compensation."  Thus, one cannot interpret the Excess Plan in a vacuum.  For any determination of Excess Plan benefits, the language of the larger Plan provides the necessary interpretive context.

Furthermore, the Excess Plan also provided that in the event of a corporate "change in control," Pennzoil would provide a "cash payment equal to the present value of" the above-listed benefits, "determined as of the date prior to the Effective Date of the change in control . . . ."  *See* Dkt. 18, Ex. D at 4; *Siegel* Dkt. 18, Ex. D at 5.  All parties agree that Shell Oil's buyout of Pennzoil, effective October 1, 2002, constitutes a "change in control" event as defined by the Excess Plan.  The parties dispute, however, the proper interpretation of "Considered Compensation" after Pennzoil enacted the Fifth Amendment to the Plan.  To understand this term, the court will briefly review the relevant Plan provisions and Plan amendments leading up to the instant case.

3

**B.  Background of the Plan**

Article IX (entitled "Pension Amounts") of the original Plan, effective January 1, 1999, provides the starting point for the calculation of benefits after a member's termination of employment.  Section 9.1(I)(a) states that retirement benefits depend, in part, on "the Member's monthly 1997 Considered Compensation," which was defined as "the lesser of (i) 1997 Considered Compensation or (ii) if the Member terminates service prior to January 1, 2003, the Member's average monthly Considered Compensation received during the 60 months immediately preceding his retirement or other termination of Service."  *See Siegel* Dkt. 18, Ex. A at 23.   In turn, "Considered Compensation," includes compensation paid to members for personal services, including wages, overtime pay, commissions, etc.  *Id.* at 4-5, § 1.11.  Importantly, under the original Plan, the term Considered Compensation specifically excluded "income arising from *the exercise of a stock option*" from its umbrella of compensation.  *Id.*  (emphasis added).

On September 20, 2001, Pennzoil adopted the Second Amendment to the Plan, effective January 1, 2001.  *See Siegel* Dkt. 18, Ex. B.  That amendment enacted certain changes to the term Considered Compensation, but left undisturbed the exclusion of income from the exercise of a stock option.  *See id.* at 1.  On March 25, 2002, the same day that the Pennzoil-Shell Oil merger was approved, the Pennzoil Board of Directors approved the amending of the Plan once again.  That resolution led to the adoption of the Fifth Amendment to the Plan.  *See id.*, Ex. C.

The Fifth Amendment, eventually executed on May 13, 2002, was given an effective date of March 1, 2002.  *Id.*, Ex. C at 5.  After the amendment, the definition of Considered Compensation read, in pertinent part, as follows:

> 1.11  <u>Considered Compensation</u>: The compensation actually paid to a Member . . .
> by his Employer for personal services, including normal salary, wages, commissions,

overtime pay, severance pay (but only if paid in normal bi-weekly installments), vacation pay, pay in lieu of vacation, bonuses (including amounts paid or cashed-out under the Company's Annual Incentive Plan and the Company's long-term incentive plans, but excluding sign-on bonuses), amounts distributed under any unfunded plan of deferred compensation maintained by the Employer (including conditional and restricted stock and dividend equivalents), and *income arising from the exercise or cash-out of a stock option* . . . . The Considered Compensation of a Member as determined by the Retirement Board from the books and records of the Member's Employer shall be conclusive. . . .

*Id.*, Ex. C at 3-4 (emphasis added). As is apparent in the preceding definition, the Fifth Amendment added one new form of compensation, namely "income arising from the exercise or cash-out of a stock option." *Siegel* Dkt. 32 at 6. Hence, Pennzoil's Board enlarged the term Considered Compensation to include income from option exercises as of March 1, 2002, the effective date of that amendment.

## C. Pennzoil Reacts to the Fifth Amendment

After the Fifth Amendment's enactment, Pennzoil made certain operational decisions reflecting the addition of option exercises to the definition of Considered Compensation. In May 2002, Pennzoil reprogrammed its computerized payroll system that tabulated earnings and other pensionable sums for Plan purposes. *Id.*, App. 4 at 3. The Director of Payroll adjusted the system so that Considered Compensation picked up sums from stock options exercised on or after March 1, 2002. Pennzoil also commissioned its Plan actuary, Mercer Human Resources Consulting ("Mercer"), to analyze the cost impact of the Fifth Amendment. Mercer "assumed that the inclusion of . . . stock options in Considered Compensation is a one-time transaction for 2002 due to special circumstances surrounding the [anticipated] Shell/Pennzoil-Quaker State buyout." Siegel Dkt. 32, App. 9 at 2-3; *id.*, Ex. B at 4. Thus, consistent with the earlier computer program adjustments, Mercer only factored exercises of stock options on or after March 1, 2002 into its overall analysis.

Based on this limited inclusion of extra income, Mercer reasoned that "the effects of the change in the definition of Considered Compensation are kept to a minimum due to the nature of the benefit formula." *Id.*, Ex. B at 5.

On May 22, 2002, James Postl, Pennzoil's CEO, sent a letter to Pennzoil employees with stock options that explained the impact of the Fifth Amendment on their pensions. Although Postl's letter does not explicitly delineate the limited effect of the Fifth Amendment, he conveys to the optionees that the amendment only picks up stock option exercises on or after March 1, 2002. *See Siegel* Dkt. 32, App. 11, Ex. D at 1 ("[I]f you have exercised any stock options *since* March 1, 2002, . . . 6% of your taxable income received from your stock option exercise will be contributed" into Pennzoil's savings plan.) (emphasis added).

Finally, Pennzoil and Mercer calculated anticipated sums that would be owed to Excess Plan participants upon the change in control. *Siegel* Dkt. 32 at 8. Pennzoil provided these participants, including Crowell and Siegel, with summaries of their anticipated lump-sum payments. Tellingly, none of these summaries contemplated the inclusion of income from the exercise of stock options before March 1, 2002 as Considered Compensation. *Id.*, App.15 at 6-8; *id.* at 12-13. In sum, after Pennzoil enacted the Fifth Amendment, it pursued several internal changes indicating that the amendment was only designed to incorporate income from option exercises on or after March 1, 2002, and not before.

Based on this construction of the Fifth Amendment, both Crowell and Siegel received "change in control" payments that were calculated to include their stock option exercises after the amendment's effective date. In total, Siegel received a pre-tax payment of $2,363,219, and Crowell received a gross payment of $845,962.98. Dkt. 39, App. 3 at 4; *Siegel* Dkt. 32, App. 12 at 2.

Plaintiffs accepted these payments, retired from Pennzoil, and have been receiving monthly pension benefits under the Plan ever since.

## II. PROCEDURAL HISTORY

Although they retired quietly from Pennzoil, plaintiffs now assert that their benefits were miscalculated due to Pennzoil's faulty interpretation of the Fifth Amendment. Crowell and Siegel claim that Pennzoil should not have excluded their option income realized before the amendment's effective date, and this error led to a substantial reduction in their retirement benefits under the Excess Plan. Crowell claims that his damages amount to $476,583.21; Siegel claims damages of $658,201.18. *See* Dkt. 18 at 10; *Siegel* Dkt. 18 at 11. The total damages claimed by the plaintiffs thus equal $1,134,784.39.

Surprisingly, after this allegedly massive underpayment, Siegel never invoked the Plan's appeals procedures to contest Pennzoil's construction of the Plan's terms.[3] Crowell, however, did apprize himself of the review process. Dkt. 39, App. 1 at 1-6. On September 22, 2003, Crowell mailed a letter to Kelley Lang, the Plan administrator,[4] and requested a revised calculation of his benefit entitlement to include income from his October 1997 exercise of stock options. After receiving Crowell's letter, Lang oversaw an investigation into Crowell's understanding of the term Considered Compensation. Lang consulted with several individuals, including John Parsons, a

---

[3] Article XIV sets forth the claim procedures, which include the presentment of a claim to the Plan administrator and an appeal process following a denial of benefits. *See Siegel* Dkt. 18, Ex. A at 36-37. The court will address the issue of administrative exhaustion more fully *infra*.

[4] Under section 15.1 of the Plan, the Retirement Board is the "plan administrator" for ERISA purposes. *See Siegel* Dkt. 18, Ex. A at 38 ("The Board of Directors shall appoint a Retirement Board . . ., which Committee shall be the "plan administrator" within the meaning of Section 404 of ERISA"). Kelley Lang was the sole member of the Retirement Board in 2003 and 2004, and thus she acted as the plan administrator throughout the pendency of Crowell's administrative appeal. Dkt. 39, App. 1 at 2.

benefits attorney and Senior Counsel at Shell Oil at the time.  He explained that the Fifth Amendment had always been interpreted to mean that only income realized from the exercise of stock options on or after March 1, 2002, and not before, was included in Considered Compensation. Lang also consulted the Payroll Director, Gail Barrows, who detailed the changes to the payroll system including option exercise income on or after March 1, 2002, but not before, within pensionable earnings.  Lastly, Lang spoke with Mark Esselman, Pennzoil's former Vice President of Human Resources.  He was familiar with the Plan's amendments, including the Fifth Amendment, and he also interpreted that amendment to have prospective effect only.  In sum, based on Lang's oral conversations with individuals familiar with the drafting and implementation of the Fifth Amendment, she concluded that Crowell misinterpreted the effect of the amendment.  Accordingly, on February 11, 2004, Lang responded to Crowell's request and denied his benefits claim.

On February 20, 2004, Crowell sent an appeal letter to Lang, in accordance with the appeal procedures set forth in the Plan.  *See Siegel* Dkt. 18, Ex. A at 36-37 (Section 14.2 contains the relevant appeal provision, including a written application for review within 60 days of notice of the unfavorable decision).  In his letter, Crowell requested that he receive a hearing before the Retirement Board and that certain documents be made available to him at that time.  Lang granted Crowell's request, and an appeal hearing was held on April 12, 2004.

To prepare for that meeting, Lang reviewed the Fifth Amendment and Crowell's letters in which he explained his claim and interpretation of that amendment.  She also looked over a binder of materials that included minutes from the Pennzoil Compensation Committee and Board meeting at which the amendment was approved.  Further, she consulted with Parsons to check on the status of a renewed investigation into the Fifth Amendment.  Parsons informed Lang that he consulted with

8

other executives with knowledge of the amendment, and they uniformly agreed that no one had ever

interpreted the amendment in the manner Crowell suggested.  Every executive and attorney who

looked at the amendment believed that its effects were not retroactive— no exercise of options prior

to March 1, 2002 was meant to be included within Considered Compensation.

Then, at the appeal hearing, Crowell provided Lang with copies of two emails from mid-

April 2002, which he claimed supported his interpretation of the Fifth Amendment.  *See* Dkt. 39,

App. 1, Ex. D.  The first email, dated April 15, 2002, was from Laura Higley, a former Baker Botts

attorney, to Linda Condit, Pennzoil's Corporate Secretary.  Higley, the drafter of the Fifth

Amendment, stated that "options, conditional stock etc., etc. [sic] has always been included" within

the definition of Considered Compensation.  *See id.* at 1.  The second email, dated April 22, 2002,

was from Condit to Esselman.  In that email, Condit recounted her own understanding from Higley

that "the option exercises have been included all along (not just going back to March 1, 2002).  The

amendment to the plan will clarify this."  *See id.* at 2.

After considering this evidence, Lang met with Parsons and requested further information

about these emails.  Parsons contacted Higley to discuss the emails and her understanding regarding

the scope of the Fifth Amendment.  In that meeting, Higley explained that when she referred in her

email to "options" which "[had] always been included" in Considered Compensation, she was not

speaking of income realized from an option *exercise*.  *See id.*, Ex. G at PQS-003240.  Rather, she

was "referring to distributions from the incentive plans" which had always been included as bonuses

within Considered Compensation, even under the original Plan.  *Id.*  Higley regrets the confusion

caused by her use of the term option, which Condit also misinterpreted, but she steadfastly maintains

that she did not mean to convey to Crowell, or anyone else, that the Fifth Amendment picked up

options *exercises* before March 1, 2002 as Considered Compensation.  *Id.*  After considering Higley's explanation and the other updates from Parsons, Lang decided to deny Crowell's appeal, and she sent a letter regarding this decision to Crowell on May 14, 2004.

Later that fall, Crowell decided to challenge the denial of benefits through the judicial process.  Crowell had been contacted by Siegel, who was also interested in a possible suit against Shell to recover benefits under their alternative interpretation of the Fifth Amendment.  The two visited a lawyer together and discussed pursuing personal claims.  Their attorney drafted a demand letter to Shell's General Counsel on behalf of both plaintiffs, and sent this letter on November 30, 2004.  The demand letter was explicitly stated to be "for settlement purposes only."  Shell did not respond to this request.

Given that a settlement seemed unavailing, plaintiffs turned to the state courts for relief.  On August 16, 2005, Crowell filed an action against Shell in the 334th Judicial District Court of Harris County, Texas, asserting state-law claims for breach of contract, breach of warranty, fraud, and promissory estoppel.  Shortly thereafter, on September 26, 2005, Siegel filed a similar action in the 190th Judicial District Court of Harris County, asserting the same claims.  Shell immediately removed both cases to federal court, claiming that the plaintiffs' state-law claims were completely preempted by ERISA, thus making federal jurisdiction appropriate.

After removal, Crowell's case was assigned to Judge Hoyt, and Siegel's case was assigned to Judge Gilmore.  Plaintiffs filed separate motions to remand.  On December 15, 2005, Judge Hoyt denied Crowell's motion in a brief order.  Dkt. 14.  Meanwhile, on September 19, 2006,  Judge Gilmore also denied Siegel's motion to remand.  *Siegel* Dkt. 23.  Siegel had argued that the Excess Plan, under which he was denied the benefits at issue, was exempt from ERISA because it had no

provisions for fiduciary control and administrative review like the larger, ERISA-governed Plan. *Id.* at 4.  Judge Gilmore rejected this argument and found that the Excess Plan was a "top-hat" plan subject to ERISA's provisions.  *Id.* at 9.  Top-hat plans are unfunded plans maintained "primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." *See Reliable Home Healthcare, Inc. v. Union Cent. Ins. Co.*, 295 F.3d 505, 512 (5th Cir. 2002).  These plans are exempt from many ERISA requirements, including the use of a plan administrator, provisions for vesting, and requirements for participation.  *Id.*; *see Reliable Home*, 295 F.3d at 512; 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1).  However, top-hat plans are subject to the "reporting, disclosure, administration, [and] enforcement provisions" of ERISA. *Reliable Home*, 295 F.3d at 515.  Accordingly, Judge Gilmore found ERISA preemption applicable to the Excess Plan and denied Siegel's motion to remand.  *Siegel* Dkt. 23 at 11.

Next, with their claims remaining in the federal forum, Crowell and Siegel filed amended complaints to include ERISA causes of action.  Crowell reasserted his state-law claims and added ERISA claims under 29 U.S.C. § 1132(a)(1)(B) (denial of benefits), § 1132(a)(2) (fiduciary breach), § 1132(a)(3) (equitable relief), § 1132(c)(1) (document nondisclosure), and § 1132(g)(1) (attorneys' fees).  Dkt. 18 at 10-15.  Siegel's amended complaint recites the identical claims as Crowell, save the ERISA document nondisclosure claim.  *Siegel* Dkt. 18 at 14-16.

Shell responded to the amended complaints by filing separate motions to dismiss (1) the plaintiffs' state-law claims; (2) their claims seeking damages for fiduciary breach under § 1132(a)(2); and (3) their claims for equitable relief under § 1132(a)(3).  On June 15, 2006, Judge Hoyt granted Shell's motion in its entirety.  Then, on October 17, 2006, Judge Hoyt recused himself from Crowell's case and it was reassigned to this court.  Meanwhile, Shell moved to consolidate Siegel's

case into Crowell's action, and on January 3, 2007, this court granted Shell's motion and consolidated the cases for trial.

Immediately the court began reviewing Shell's pending motion to dismiss in Siegel's case. After considering the arguments of the parties and the relevant case law, the court granted Shell's motion and dismissed Siegel's claims for fiduciary breach and equitable relief.[5]   Consequently, plaintiffs' only remaining common causes of action are for a denial of benefits under § 1132(a)(1) and for attorneys' fees and costs under § 1132(g)(1).   Crowell also maintains a document nondisclosure claim under § 1132(c).   The parties have filed cross motions for summary judgment, responses and replies thereto, and the case is ripe for decision.

### III. SUMMARY JUDGMENT STANDARD

When considering a summary judgment motion, Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548 (1986). The party moving for summary judgment must demonstrate that there are no genuine issues of material fact. *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006).   An issue is "genuine" if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986); *Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 454 (5th Cir. 2005).   An issue is "material" if its resolution could affect the outcome of the action. *Anderson*, 477 U.S. at 248.

In responding to a properly supported summary judgment motion, the nonmovant cannot

---

[5] Shell also moved to dismiss Siegel's state-law claims. *Siegel* Dkt. 19 at 7-9.  However, before the court ruled on Shell's motions, Siegel agreed to dismiss its state-law claims against Shell, and Judge Gilmore signed an order to this effect. *See Siegel* Dkt. 28.  This court consequently denied as moot the portion of Shell's motion addressing these claims. Dkt. 55.

merely rely on its pleadings, but must present specific and supported material facts, of significant probative value, to preclude summary judgment.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.11, 106 S. Ct. 1348 (1986); *Guillory v. PPG Indus., Inc.*, 434 F.3d 303, 309 (5th Cir. 2005).  In determining whether a genuine issue of material fact exists, the court views the evidence and draws inferences in the light most favorable to the nonmoving party.  *See Anderson*, 477 U.S. at 255; *Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 332 (5th Cir. 2005). The nonmovant's burden is not satisfied by "some metaphysical doubt as to material facts," conclusory allegations, unsubstantiated assertions, speculation, the mere existence of some alleged factual dispute, or "only a scintilla of evidence." *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1429 (5th Cir.1996) (citing *Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir. 1994); *State Farm Life Ins. Co. v. Gutterman,* 896 F.2d 116, 118 (5th Cir.1990) (citing *Anderson,* 477 U.S. at 247-48)). Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to his case on which he bears the burden of proof at trial. *See Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S. Ct. 1689 (1993).

## IV. ANALYSIS

As summarized above, the remaining claims before this court are as follows: (1) Plaintiffs' § 1132(a)(1) claim for a denial of benefits under the Excess Plan; (2) Crowell's § 1132(c) claim for nondisclosure of documents to which he was allegedly entitled; and (3) Plaintiffs' § 1132(g)(1) claim for attorneys' fees incurred in prosecuting these actions.  These claims will be addressed in turn.

### A. Denial of Benefits, § 1132(a)(1)

Generally, in a claim for benefits under ERISA, the plaintiff must "first exhaust [his] administrative remedies" under the benefits plan before seeking relief in a court of law.  *See Denton v. First Nat'l Bank of Waco, Texas*, 765 F.2d 1295, 1303 (5th Cir. 1985).  In this case, it is

undisputed that Crowell exhausted his administrative remedies as set forth in Article XV of the Plan. Siegel, on the other hand, did not.  Thus, before reaching the merits of plaintiffs' benefits claims, the court will consider whether Siegel's claim in particular is premature for failure to exhaust his administrative remedies under the Plan.

### 1. Exhaustion of Siegel's Remedies

The Fifth Circuit has unequivocally held that a plaintiff must exhaust any available administrative remedies before filing a suit for benefits under ERISA; otherwise, plaintiff's claim is premature and should be dismissed.  *Coop. Ben. Admn'rs, Inc. v. Ogden*, 367 F.3d 323, 336 (5th Cir. 2004) (affirming a grant of summary judgment when plaintiff presented no evidence that she exhausted her administrative remedies or that such efforts would have been futile); *see also Medina v. Anthem Life Ins. Co.*, 983 F.2d 29, 33 (5th Cir. 1993).  Shell argues that Siegel's claim is premature because although "he seeks benefits allegedly due under the Retirement Plan and asks the Court to interpret that Plan, he never pursued the administrative remedies set forth in the Plan."  *See Siegel* Dkt. 32 at 12.  Siegel responds that he cannot be required to seek administrative review as a prerequisite for filing suit because his claim arises under the separate top-hat plan, the Excess Plan, which "contains no provision for administrative remedies." *See Siegel* Dkt. 36 at 15.  In essence, the question before this court is as follows: Must a plaintiff exhaust a plan's administrative remedies when seeking redress under a distinct top-hat plan, which lacks administrative procedures but depends on terms within the larger plan to determine benefits?

This is apparently an issue of first impression for the courts, as neither side has cited any case law to support its arguments.  Instead, the litigants argue that the court should consider the congressional concerns underlying the exhaustion requirement to decide the issue.  The court agrees.

When Congress enacted ERISA in 1974, it made no mention of exhaustion within the

14

statutory language.  Rather, ERISA exhaustion is purely a creature of the common law.  Courts reason that because ERISA requires internal review procedures in covered benefit plans, *see* 29 U.S.C. § 1133, plan participants must exhaust these remedies before filing suit to effect ERISA's mandate of administrative review.  The exhaustion requirement also serves to (1) minimize the number of frivolous ERISA lawsuits; (2) promote the consistent treatment of benefit claims; (3) provide a nonadversarial dispute resolution process; and (4) decrease the cost and time of claims settlement.  *See Denton*, 765 F.2d at 1300-02 (detailing the congressional purpose of requiring benefits plans to institute procedures for review of benefit denials); *see also Makar v. Health Care Corp. of Mid-Atlantic (Carefirst)*, 872 F.2d 80, 83 (4th Cir. 1989); *Mason v. Continental Group, Inc.*, 763 F.2d 1219, 1227 (11th Cir. 1985); *Kross v. W. Elec. Co.*, 701 F.2d 1238, 1243-45 (7th Cir. 1983); *Amato v. Bernard*, 618 F.2d 559, 567 (9th Cir. 1980). In short, "[i]t would certainly be anomalous if the same good reasons that presumably led Congress . . . to require covered plans to provide administrative remedies for aggrieved claimants did not lead the court to see that those remedies are regularly used." *Denton*, 765 F.2d at 1301.

Although he acknowledges each of these concerns, Siegel contends that the exhaustion requirement is inapplicable to his case.  He asserts that he is not subject to the Plan's administrative procedures because his benefits claim actually arises under the Excess Plan, a top-hat plan which does not provide for administrative review.  *See Siegel* Dkt. 36 at 15; *see also* 29 U.S.C. § 1101(a)(1) (excepting top hat plans from scope of coverage of ERISA's fiduciary provisions); § 1102(a)(1) (recognizing that benefit plans must designate a fiduciary to serve as the plan administrator); *Garratt v. Knowles*, 245 F.3d 941, 948 n.6 (7th Cir. 2001) ("a top hat plan . . . is exempt from ERISA's vesting, participation, funding, and *fiduciary* rules").

Siegel's contention is clever, but ultimately unpersuasive.  Even Siegel's amended complaint

15

states that the "Plan administrator unreasonably failed to construe the terms of the Plan and of the Agreement in accordance with their plain language meaning," *see Siegel* Dkt. 18 at 14, including the term "Considered Compensation." This term, which does affect the total payout under the Excess Plan, is defined only in the Retirement Plan and is to be interpreted solely by the plan administrator. *See id.*, Ex. C at 4 ("The Considered Compensation of a Member as determined by the Retirement Board [Pennzoil's plan administrator] from the books and records of the Member's Employer shall be conclusive"). Accordingly, Siegel's claim for benefits under the Excess Plan is inseparable from an interpretation of the Retirement Plan. Logic dictates that Siegel, a Plan participant, must seek the Plan's explicit internal review procedures when challenging a Plan term upon which his excess compensation depends.

Were the court to hold otherwise, a key congressional concern in mandating these administrative review procedures—"the consistent treatment of benefit claims"—would be disregarded. *Makar*, 872 F.2d at 83. Shell correctly states that "under Siegel's theory, different procedures for disputing Retirement Plan interpretations should apply: Retirement Plan participants who qualify for excess benefits should be able to bypass the Retirement Plan's administrative review, while those who do not should follow the Plan's procedures." *Siegel* Dkt. 53 at 2. This bifurcated analysis risks an "[in]consistent treatment of claims" and is thus anathema to Congress's purposes in mandating the exhaustion requirement. *Cf. Makar*, 872 F.2d at 83. Further, for the court to find for Siegel on this issue, it would suggest that review of Plan terms is within the province of the judiciary. Congress clearly did not intend this result, and instead "intended plan fiduciaries, *not the federal courts*, to have primary responsibility for claims processing." *Id.* (emphasis added). Siegel was indeed required to seek the administrative remedies of the Retirement Plan before filing

suit.[6]  Consequently, his benefits claim should be dismissed.[7]

## 2. Standard of Review of the Plan

As the court approaches the merits of the ERISA benefits claim, it next must determine what standard of review applies in evaluating Lang's decision.  Shell argues that the Plan provides that the administrator with the discretion to construe and interpret the Plan's terms, *see Siegel* Dkt. 18, Ex. A at 39, and thus this court should evaluate her decision under an abuse of discretion standard. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 105,  109 S. Ct. 948 (1989) (O'Connor, J.) (explaining that when a plan vests discretion in a fiduciary to interpret its terms, the court should only review those interpretations for an abuse of discretion); *Duhon v. Texaco, Inc.*, 15 F.3d 1302, 1305 (5th Cir. 1994); *Perdue v. Burger King Corp.*, 7 F.3d 1251, 1254 (5th Cir. 1993).  Plaintiffs respond with an argument that echoes Siegel's contentions regarding exhaustion.  They argue that an abuse of discretion standard does not apply because the benefits they seek arise under the Excess

---

[6] Siegel alternatively argues that if the court reaches this result, then his attorney's settlement attempts should constitute an *ad hoc* appeal to meet the exhaustion requirement. However, these contacts were insufficient to meet the Plan's internal procedures which mandate review by the *plan administrator*.  *See Siegel* Dkt. 18, Ex. A at 36-37. Also, Siegel's citation to *Hall v. Nat'l Gypsum Co.*, 105 F.3d 225 (5th Cir. 1997) is inapposite.  In *Hall*, the court found the exhaustion requirement inapplicable to a plan in which no administrative review mechanisms were in place at the time the claim arose.  *See Hall*, 105 F.3d at 232.  By contrast, Pennzoil's Retirement Plan, the interpretation of which Siegel contests, has always had clear procedures for internal review in effect.  Siegel's failure to employ these procedures in particular renders his claim premature.

[7] Rather than dismiss his case outright, Siegel requests that the court stay the proceedings so that he may pursue administrative remedies.  In other circumstances the court might agree. But in this case the parties have already briefed the court on the merits of the benefits claim in both suits, and the court is ready to rule.  And as the court finds Crowell's identical claim insufficient as a matter of law, *see infra*, there is no need to stay Siegel's case when the same unfavorable outcome is assured.  *Cf. Offutt v. Prudential Ins. Co. of Am.*, 735 F.2d 948, 950 (5th Cir. 1984) (refusing to remand the case to a plan administrator when such action would be a "useless formality").  The court thus will reach the merits of Shell's summary judgment motions in both cases.

Plan, which does not provide for discretionary review.  Dkt. 42 at 14-15; *Siegel* Dkt. 32 at 11-12. Without any administrative obstacles present in the Excess Plan, plaintiffs' reasoning goes, the court is free to evaluate the Excess Plan's provisions *de novo* and disregard any decisions by Lang or any other Shell employee.  *See, e.g.*, *Siegel* Dkt. 36 at 12.

Plaintiffs' claims are unavailing, and the court agrees with Shell.  When excess plans entirely depend on the definitions of a companion retirement plan, the court should exercise deference in reviewing the interpretations of an administrator with discretionary authority.  *See Edwards v. Texas-New Mexico Power Co.*, 259 F. Supp. 2d 544, 550 (N.D. Tex. 2003); *see also Olander v. Bucyrus Erie Co.*, 187 F.3d 599, 607 (7th Cir. 1999).  *Edwards* is directly on point.  In that case, the court encountered an analogous situation with a pension plan and supplemental benefits plan.  The court held that an abuse of discretion standard applies to claims under the supplemental plan that "necessarily depended upon the underlying pension plan, which contained the relevant terms and definitions" construed by the plan administrator.  *See Edwards*, 259 F. Supp. 2d at 550. Like the supplemental plan in *Edwards*, Pennzoil's Excess Plan relied on the underlying Plan for its definitions.  The pension plan in *Edwards* also contained similar language vesting discretion in the plan administrator as Pennzoil's Plan; the plan administrator had the final authority to "construe and interpret" the plan at issue.  Accordingly, as in *Edwards*, an abuse of discretion standard of review applies to Lang's decision.[8]

---

[8] Plaintiffs boldly assert that "[b]enefit determinations under top hat plans are given *de novo* review in the Fifth Circuit."  *See Siegel* Dkt. 36 at 12 (emphasis in original) (citing *Acosta v. Bank of Louisiana*, No. Civ.A 01-2194, 2003 WL 24176353 (E.D. La. Apr. 3, 2003), *aff'd* 88 F. App'x 688 (5th Cir. 2004)).  However, this broad claim is totally insupportable, as *Acosta* is easily distinguishable.  *Acosta* dealt with a top-hat plan that did *not* rely on the terms of an underlying pension plan, so *de novo* review was appropriate in those circumstances.  *See* 2003 WL 24176353, at *1-4.  The Excess Plan, by contrast, clearly relies on a linked plan for interpretation of the Excess Plan's terms, leading to the logical conclusion that an abuse of

### 3.  Did Lang Abuse Her Discretion in Denying the Benefits Claim?

The traditional abuse of discretion standard in ERISA cases involves a two-step process.[9]

"First the court determines whether the administrator's interpretation of the plan is legally correct."

*Abouh-Fetouh v. Employee Benefits Comm.*, 245 F.3d 465, 472 (5th Cir. 2001) (citing *Threadgill*

*v. Prudential Sec. Group, Inc.*, 145 F.3d 286, 292 (5th Cir. 1998)).  "If the court determines that the

plan administrator's interpretation of the plan is legally correct, then the administrator's

interpretation and the denial of benefits should be upheld because there cannot have been any abuse

of discretion."   *Id.*   "If, on the other hand, the court determines that the plan administrator's

interpretation is not legally correct, then the court must proceed to determine whether the

administrator's decision denying benefits was an abuse of discretion."   *Id.* (citing *Threadgill*, 145

F.3d at 293).

---

discretion standard of review should apply.  Furthermore, the Fifth Circuit in *Acosta* did not mandate "*de novo* review" for top-hat plans, *see Siegel* Dkt. 36 at 12, and expressly declined to decide what level of review applies to such plans.  *See Acosta*, 88 F. App'x at 690 ("We need not decide this issue, because we note that even under the more deferential abuse of discretion standard the bank's denial of benefits cannot stand.").  Plaintiff's aforementioned statement thus lacks its purported *ex cathedra* punch–it is in fact quite in error.

[9] In Crowell's motion for partial summary judgment, he argues that if the court applies the abuse of discretion standard, it should lessen its deference to Lang's decision "'in proportion to the administrator's apparent conflict.'"  *See* Dkt. 35 at 7-8 (quoting *Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 296 (5th Cir. 1999) (en banc)).  This has often been termed the "sliding scale" test.  *See Vega*, 188 F.3d at 297; *see also Maclachlan v. ExxonMobil Corp.*, 350 F.3d 472, 478-79 (5th Cir. 2003).  However, Crowell has presented no evidence of a conflict of interest other than to assert that Lang, a Shell employee, is "manifestly" operating under a conflict because any benefits granted to Crowell will also be paid by Shell, the plan sponsor. Dkt. 35 at 8.  Indeed, the Fifth Circuit has explicitly found that this showing, without more, is insufficient to establish a conflict of interest.  *See Maclachlan*, 350 F.3d at 479 n.8.  And even assuming a conflict exists, the court would still grant Shell's motions for summary judgment. Any such conflict would only cause a "modicum less deference" to be shown to the administrator, *see id.* at 479, and this minor change would not materially affect the court's decision.

Utilizing the two-step process above, the court first engages in a threshold inquiry of whether Lang's decision to deny plaintiffs' benefits was "legally correct." *Abouh-Fetouh*, 245 F.3d at 472. In answering this question, the court must consider: "(1) whether the administrator has given the plan a uniform construction, (2) whether the interpretation is consistent with a fair reading of the plan, and (3) any unanticipated costs resulting from different interpretations of the plan." *Ellis v. Liberty Life Assurance of Boston*, 394 F.3d 262, 270 (5th Cir. 2004) (citing *Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 637 (5th Cir. 1992)). The court will address these factors in turn.[10]

### a. Uniform construction of the Retirement Plan's Fifth Amendment

Lang interpreted the Fifth Amendment to the Plan, effective March 1, 2002, to include only income realized from option exercises *on or after* March 1, 2002, but not before, within Considered Compensation. *Siegel* Dkt. 32, App. 2 at 2. As the facts recited above demonstrate, this interpretation was uniformly applied in determining Crowell and Siegel's pensionable earnings, and Pennzoil's actions in reprogramming its computers and calculating the effects of the Fifth Amendment support this construction. Also, after the Pennzoil/Shell Oil merger, Shell Oil's Pension Plan administrator reached the same conclusion as Lang in construing the Fifth Amendment. Even the plaintiffs, who challenge the proper interpretation of the Fifth Amendment, do not claim that Shell ever interpreted the amendment in an inconsistent manner. *See Siegel* Dkt. 32, App. 13 at 113-14 (reproducing Siegel's deposition testimony in which he confirms that Shell's interpretation

---

[10] Plaintiffs alternatively contend that the court need not engage in this analysis because Lang's decision is a *per se* abuse of discretion by interpreting the Plan "in a manner that directly contradicts the plain meaning of the plan language." *See Siegel* Dkt. 36 at 13 (citing *Gosselink v. AT&T, Inc.*, 272 F.3d 722, 727 (5th Cir. 2001)). However, the court need not address this argument because of its later conclusion that Lang's reading of the Plan was a fair and reasonable one, even though the language could be considered ambiguous. Accordingly, her construction of the Fifth Amendment did not "directly contradict" the plain meaning of the amendment's words, and *Gosselink* is inapplicable to this case.

excluding option exercise income realized before the amendment's effective date never varied, even though he believed "there was always a mistake in the calculation of the formula not to include it"); *id.*, App. 14 at 96-97 (recounting Crowell's deposition testimony in which he admits that he was consistently told that his option exercise income from 1997 would not be part of his Considered Compensation).

And yet, despite their admissions to the contrary, plaintiffs argue that this factor weighs in their favor because Shell inconsistently applied *other* Fifth Amendment provisions not at issue in this litigation. *See, e.g.*, *Siegel* Dkt. 36 at 18 (claiming that Shell inconsistently construed the phrase "compensation actually paid" to include phantom income for some, but only actual earnings for others). As Shell correctly responds, these ancillary interpretations are irrelevant to the narrow question of whether Lang consistently construed Considered Compensation to exclude the option exercises at issue. *See Siegel* Dkt. 53 at 5-6; *Batchelor v. Int'l Bhd. of Elec. Workers Local 861 Pension & Retirement Fund*, 877 F.2d 441, 444-45 (5th Cir. 1989) (framing the uniformity of construction factor narrowly, without regard to interpretations of other Plan terms, asking whether the defendant previously interpreted the contested term in favor of a plan participant); *Bayles v. Cent. States, Southeast & Southwest Areas Pension Fund*, 602 F.2d 97, 100 (5th Cir. 1979) (finding that the evidence established a uniform interpretation of what constitutes "employment in the teamster industry"). All of the relevant evidence indicates that Lang uniformly construed the term Considered Compensation to exclude option income predating the Fifth Amendment. *See Bayles*, 602 F.2d at 100. Thus, the uniform construction factor weighs in Shell's favor.

**b. A Fair Reading of the Fifth Amendment**

The court next considers whether Lang's construction was consistent with a fair reading of the Fifth Amendment. To determine whether a plan administrator's reading of a provision is a "fair

. . . and reasonable one," *see Lowry v. Bankers Life & Cas. Retirement Plan*, 865 F.2d 692, 694 (5th Cir. 1989), the court must interpret the ERISA plan in an ordinary and popular sense as a person of average reason and intelligence, or in the same manner as the average plan participant.  *See Tucker v. Shreveport Transit Mgmt., Inc.*, 226 F.3d 394, 398 (5th Cir. 2000) (internal quotation marks omitted); *see also Giunta v. Mobil Corp. Employee Severance Plan*, 205 F. Supp. 2d 715, 724 (S.D. Tex. 2002).  Shell argues that Lang's interpretation is a fair reading of the Fifth Amendment when viewed in the amendment's proper context.  The amendment had a retroactive effective date of March 1, 2002, shortly before news of the merger was released, *see Siegel* Dkt. 32, App. 6 at ¶ 5; *id.*, Ex. A at PQS-002011, to benefit those who cashed out their options upon hearing of a possible merger.  One can infer that the Fifth Amendment's expansion was limited in scope to benefit those who exercised options on or after March 1, 2002, and not before.  Shell buttresses this reasonable inference by pointing out that the Fifth Amendment was approved by the Board of Directors concurrently with that body's approval of the merger.  *Id.*, App. 2, Ex. G at PQS-003284-85. Plaintiffs only credible response[11] to this argument is that the exclusion of option exercises before March 1, 2002  means that wages and salary earned before that date should also be excluded, if the effective date determines the beginning of earnings calculations.  *See, e.g.*, *Siegel* Dkt. 36 at 18-19. Plaintiffs contend that such a construction would "cripple retirees' benefits," and this result cannot have been the intent of the Fifth Amendment.  *Id.* at 18.

---

[11] Plaintiffs also argue that Lang's refusal "to read the Fifth Amendment with Crowell" at his appeal hearing is further evidence of her unfair reading of that amendment. *See, e.g.*, *Siegel* Dkt. 36 at 19.  However, the court is unsure how this evidence relates to the issue of Lang's *interpretation* of the Plan.  It is true that Lang could have reread the amendment with Crowell, but her failure to do so is irrelevant to her interpretation thereof.  To be sure, her "failure" in this regard lacks the "significant probative value" needed to defeat summary judgment. *See United States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001).

At first blush, plaintiffs' argument seems logical.  Upon closer inspection, however, its intellectual force dissipates.  Before the enactment of the Fifth Amendment, wages and salaries had always been included within Considered Compensation.  *See Siegel* Dkt. 18, Ex. A at 4-5.  Thus, rather than limiting any such income accrued before the effective date, the Fifth Amendment simply added a new form of income, namely that realized from the exercise of a stock option, on or after the amendment's effective date.  This conclusion is logical, given that ERISA forbids employers from decreasing the "accrued benefit of a participant under the plan." 29 U.S.C. § 1054(g)(1).  This interpretation, when considering the plan as a whole, is consistent with a fair reading of the Fifth Amendment, and the "average plan participant" would agree.  *Tucker*, 226 F.3d at 398.  Plaintiffs' claims to the contrary are self-serving, conclusory allegations that cannot create a genuine issue of material fact to preclude summary judgment.  *See Nebraska,* 507 U.S. at 590; *see also Forsyth*, 19 F.3d at 1533.  The "fair reading" factor also weighs in Shell's favor.

### c.  Unanticipated Costs Under Plaintiffs' Interpretation

Lastly, if plaintiffs' alternative interpretation of the Plan would result in unanticipated costs, "that interpretation is less likely to be legally correct."  *See Batchelor*, 877 F.2d at 445.  In both of the instant cases the parties challenge the amount of additional costs, but they do not contest the *existence* of these costs that Shell would bear under plaintiffs' construction of the Fifth Amendment.  *See, e.g.*, *Siegel* Dkt. 32 at 19; *Siegel* Dkt. 36 at 19-20.  If the court accepted plaintiffs' interpretation of what constitutes Considered Compensation, Shell would be liable in this case for more than $1,130,000 in additional benefits and for an undetermined amount of costs owed to other participants.  Thus, under plaintiffs' alternative interpretation, substantial additional costs would be owed to plan participants, including Crowell and Siegel.

The parties' real dispute is whether these costs were "unanticipated" by Pennzoil.  Plaintiffs

contend that Pennzoil anticipated these costs because key executives accepted plaintiffs' interpretation of the Fifth Amendment weeks before its enactment.  Under the plaintiffs' theory, Laura Higley's email, in which she stated option income was "always included" within Considered Compensation, and Condit's subsequent email confirming this interpretation are enough items of evidence to raise a fact issue regarding Pennzoil's expectation of costs.  Again, the court disagrees.

It is clear beyond peradventure that Pennzoil never anticipated the added costs which would result under plaintiffs' construction of Considered Compensation.  Indeed, Pennzoil made changes to its computer system to reflect its interpretation, and Mercer estimated the overall costs arising from the Fifth Amendment with the explicit assumption that the exercises of options on or after March 1, 2002 alone would affect Considered Compensation.  The disputed emails, plaintiffs' only evidence for this issue, only nominally support their position.  After Higley reviewed these emails, she stated that plaintiffs misinterpreted her statement that "options . . . [had] always been included" within Considered Compensation.  *See* Dkt. 39 at 14.  She confirmed that she was not referring to option exercises, but to option income in the form of bonuses, which had always been included within Considered Compensation.  The Fifth Amendment clarified this treatment.  Plaintiffs' contrary interpretation of these emails is but a scintilla of evidence favoring their position against the myriad pieces of evidence confirming Pennzoil's uniform construction of the Fifth Amendment.  As plaintiffs are no doubt aware, a scintilla of evidence is insufficient to preclude summary judgment when no reasonable factfinder could find for the nonmovant.  *See Douglass*, 79 F.3d at 1429.  Accordingly, the unanticipated costs factor weighs in Shell's favor.

### 4.  Conclusion

After resolving each of the relevant factors in Shell's favor, the court finds that Lang, the plan administrator, gave a legally correct interpretation of the plan provision in question.  This finding

24

pretermits "any need to consider whether a legally incorrect interpretation of the fiduciary was not an abuse of discretion."[12] *Ellis*, 394 F.3d at 270.  The plaintiffs' § 1132(a)(1) claims for benefits fail as a matter of law.

### B.  Document Nondisclosure, § 1132(c)(1)

Crowell alone asserts a claim for civil penalties under § 1132(c)(1) for failing to disclose Plan documents pursuant to §§ 1022 and 1024.  Dkt. 18 at 11.  Shell responds that this claim cannot proceed, for three reasons: (1) the administrator is the only person liable under § 1132(c)(1), and she has not been named as a defendant; (2) Crowell was provided with all documents to which he was legally entitled under ERISA; and (3) he suffered no prejudice by the denial, a prerequisite for penalties.  Dkt. 39 at 26.  The court need not address whether Shell failed to provide certain documents to Crowell or whether such failure prejudiced Crowell's claim, because Crowell did not name the proper defendant in his suit.  Section 1132(c)(1) provides, in pertinent part:

> Any *adminstrator* . . . who fails or refuses to comply with a request for any

----

[12] Even if the court assumes, for the sake of argument, that Lang's decision was legally incorrect, the court would not hold that Lang abused her discretion.  Under the abuse of discretion standard, three factors are relevant: "(1) the internal consistency of the plan under the fiduciary's interpretation; (2) any appropriate regulations formulated by the appropriate administrative agencies; and (3) the factual background of the determination and any inferences of lack of good faith."  *Ellis*, 394 F.3d at 272 (citing *Wildbur*, 974 F.2d at 638).

As the court's evaluation of Lang's decision makes clear, her construction was logical in the context of the Fifth Amendment and the overall Plan.  Thus, the first *Wildbur* factor–the internal consistency of the plan under the administrator's interpretation–weighs in Shell's favor.  The second *Wildbur* factor–the relevant administrative regulations–is neutral.  Neither party has drawn the court's attention to any such applicable regulations.  And as to the third factor–the factual background and any inferences of a lack of good faith–this also weighs in Shell's favor.  Plaintiffs attempt to discredit Lang's handling of Crowell's appeal and claim that her actions display a "rampant" degree of bad faith.  *See* Dkt. 42 at 25-28.  However, plaintiffs' evidence, of which many items lack substantiation, do not raise any inferences of bad faith.  Crowell was given a full and fair hearing before the plan administrator, and that proceeding was not held in a "kangaroo court."  *Id.* at 26.  In sum, concluding that all three factors would weigh in Shell's favor, the court would not find that Lang abused her discretion in denying Crowell's claim.

information which *such administrator* is required by this subchapter to furnish to a participant or beneficiary . . . may in the court's discretion be *personally liable* to such participant or beneficiary [for civil penalties] . . . .

*Id.* (emphasis added).  The term "administrator" is defined as "the person specifically so designated by the terms of the instrument under which the plan is operated."  *See* § 1002(16)(A)(i).  Thus, ERISA's clear statutory language requires a plaintiff to name the plan administrator, as designated by the plan itself, in suits for civil penalties.

Under the Pennzoil Plan, the designated plan administrator is the Retirement Board.  *See Siegel* Dkt. 18, Ex. A at 38, § 15.1.  The Retirement Board's sole member during the relevant period was Kelley Lang, and thus she alone was the "administrator" for ERISA purposes.  *See* Dkt. 39 at 26; Dkt. 42 at 28.  Still, Crowell contends that Shell is also liable because Lang is merely an employee of Shell.  *See* Dkt. 42 at 28.  Under Crowell's reasoning, which incidentally is bereft of any statutory or case law for support, Lang will be indemnified by Shell, the real party in interest, for any liability.  Thus, Shell should also be subject to civil penalties.  The court disagrees.

The plain and unambiguous language of § 1132(c)(1) requires that the plaintiff seek relief from the plan administrator, who is *personally liable* for any disclosure violations.  *See* § 1132(c)(1).  The statute makes no provision for liability to attach to any other person, even when the administrator is an employee of the plan sponsor.  *See, e.g.*, *Thorpe v. Retirement Plan of the Pillsbury Co.*, 80 F.3d 439, 444 (10th Cir. 1996) ("Because the Retirement Plan specifically designates the Board as its administrator, the Board is the only party liable to [p]laintiff under § 1132(c)); *Klosterman v. W. Gen. Mgmt., Inc.*, 32 F.3d 1119, 1122 (7th Cir. 1994) ("[A]ny cause of action for violations of these disclosure requirements is proper only against the plan administrator"); *Lee v. Burkhart*, 991 F.2d 1004, 1010 (2d Cir. 1993) (same).  Accordingly, the court holds that a plaintiff must name the designated plan administrator as a defendant to recover civil penalties under

26

§ 1132(c)(1).  Failure to do so is fatal to the claim.  As Lang, the plan administrator, is not a

defendant in Crowell's suit, his § 1132(c)(1) claim must be dismissed.

### C.  Attorneys' Fees and Costs, § 1132(g)(1)

The court now turns to plaintiffs' final claim, a request for attorneys' fees and costs under

§ 1132(g)(1) incurred in the prosecution of this action.  *See* Dkt. 18 at 12; *Siegel* Dkt. 18 at 15-16.

In an ERISA case, the court in its discretion "may allow a reasonable attorneys' fee and costs of

action to either party."  § 1132(g)(1).  Furthermore, in this circuit, there is no requirement that a party

prevail as a prerequisite to seeking attorneys' fees and costs.  *See Gibbs v. Gibbs*, 210 F.3d 491, 503

(5th Cir. 2000).  *But cf. Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472, 478 (7th Cir. 1998)

(requiring that a litigant reach "prevailing party" status before being eligible for an award of fees and

costs); *Martin v. Blue Cross & Blue Shield of Va., Inc.*, 115 F.3d 1201, 1209-1210 (4th Cir. 1997)

(same).  The court must consider the following five factors:

> (1) the degree of the opposing parties' culpability or bad faith;
>
> (2) the ability of the opposing parties to satisfy an award of attorneys' fees;
>
> (3) whether an award of attorneys' fees against the opposing party would deter other persons acting under similar circumstances;
>
> (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and
>
> (5) the relative merits of the parties' positions.

*Gibbs*, 210 F.3d at 504 (quoting *Iron Workers Local No. 272 v. Bowen*, 624 F.2d 1255, 1266 (5th

Cir. 1980)).  "No one of these factors is necessarily decisive, . . . but together they are the nuclei of

concerns that a court should address in applying section [§ 1132(g)]." *Bowen,* 624 F.2d at 1266.

After carefully considering these factors, the court concludes that plaintiffs are not entitled to an

award of attorneys' fees and costs, and thus their claims must be denied.

## V. CONCLUSION

After reviewing the arguments of the parties, the summary judgment record, and the applicable law, the court finds that Shell's motions for summary judgment (Dkt. 39; *Siegel* Dkt. 32) are GRANTED. Plaintiff Crowell's partial motion for summary judgment (Dkt. 35) is DENIED as moot, and plaintiff Siegel's motion for summary judgment (*Siegel* Dkt. 34) is DENIED as moot. Plaintiffs' claims for attorneys' fees under § 1132(g)(1) are DENIED.

It is so ORDERED.

Signed at Houston, Texas on March 7, 2007.

_____
Gray H. Miller
United States District Judge